## DAWSON v. CHICAGO, R. I. & P. RY. CO.

(Circuit Court of Appeals, Eighth Circuit. March 31, 1902.)

No. 1,600.

MASTER AND SERVANT—DEATH OF BRAKEMAN—CONTRIBUTORY NEGLIGENCE.

Where a brakeman, going between two cars, which were moving quite fast, seized a grip iron on the end of a flat car, which was primarily designed to be used for making couplings, and, in attempting to step on a swinging brake beam to ride to a car which he had been directed to take up, was killed, and there were hand holds on the side of a box car next to the flat, which he might have used without any risk, if he desired to ride, he was guilty of negligence contributing to his death, and precluding a recovery.

Caldwell, J., dissenting.

In Error to the Circuit Court of the United States for the District of Kansas.

Thomas P. Fenlon (B. F. Endres, on the brief), for plaintiff in error.

W. F. Evans (M. A. Low, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. This was an action for personal injuries, in which the trial court, after hearing all the testimony, directed a verdict in favor of the defendant company. Whether such direction was proper is the sole question presented by the record, and the facts on which the decision must turn are few and simple. Alberta M. Dawson, the husband of Daisy Dawson, the plaintiff in error, was a brakeman in the employ of the Chicago, Rock Island & Pacific Railway Company, the defendant in error. On November 5, 1898, the freight train on which he was employed as head brakeman arrived at Narka, Kan., between 2 and 3 o'clock p. m.; having started from Phillipsburg, Kan., that morning, and being on its way to Fairbury, Neb. Arriving at Narka, his conductor ordered him to pick up a car which was standing on the house track, and place it in the train. With this purpose in view, the engine, with two cars attached, —the one next to the engine being a box car, and the other a flat car belonging to the Lake Shore & Michigan Southern Railway Company, and loaded with piling,—were accordingly detached from the train, and run forward eastwardly some distance from the station, beyond a switch, with a view of backing in on the house track, and picking up the car, which was standing from 130 to 150 feet west of the switch. Dawson and another person, by the name of Short, who was not in the employ of the defendant company, appear to have ridden on the flat car from the station to the switch, where Dawson jumped off for the purpose of throwing the switch. While so riding they stood on the swinging brake beam of the flat car, maintaining their footing thereon by means of two hand holds (one on each side of the drawhead) at the end of the car. When the engine backed down in obedience to the signal to pass in on the house track, Dawson, who was then standing near the switch, stepped in, or swung

himself in, as one witness says, between the box car and the flat car, seizing one of the hand holds at the end of the flat car, and stepped, or attempted to step, on the swinging brake beam, either with the intention of standing thereon and riding back to where the car was to be picked up, or with a view of climbing up on the flat car. The hand hold gave way because one of the screws by which it was held in place was screwed into wood that had become rotten; the result being that he fell across the track and was run over, sustaining injuries on account of which he died the succeeding day. The flat car to which the defective hand hold was attached, as before stated, was a foreign car, and had come into the possession of the defendant company at Phillipsburg, Kan., on the night preceding the accident. It had been placed in the train on which Dawson was a brakeman early in the morning of the day the accident occurred, and had been hauled in that train from Phillipsburg to Narka. The hand hold which proved to be defective was placed there in obedience to the act of congress of March 2, 1893 (27 Stat. 531, c. 196). The purpose of requiring grip irons or hand holds to be placed at the end of cars used in interstate commerce seems to have been to afford greater security for employés when they are in the act of coupling or uncoupling cars. One of the plaintiff's witnesses, who was nearest to the train when the accident occurred, testified that the engine and cars were backing in on the switch "tolerably fast," or "pretty swift," when Dawson swung in between the cars and stepped on the brake-beam, while another witness, who was farther away, said that they were moving slowly.

It is claimed on behalf of the plaintiff that the facts above recited, concerning which there was no dispute, would have warranted the jury in finding that the defendant company, in the exercise of ordinary care, ought to have discovered the defect in the hand hold or grip iron on the end of the foreign car prior to the accident, and that it was guilty of negligence in not making such discovery. It is also claimed that the facts would have warranted a jury in finding that Dawson acted with ordinary prudence on the occasion in question, and was not guilty of contributory negligence.

Relative to the first of these contentions, we observe that as the flat car to which the hand hold was bolted had been received by the defendant company on the evening previous to the accident, and had passed only one inspection point prior thereto; and as there does not seem to have been any outward evidence that the timber was rotten where one end of the hand hold was bolted, until the screw came out and disclosed that the wood was decayed, or "doty," as one witness says, it is at least questionable whether a jury could reasonably have found that the defendant company was guilty of culpable negligence in not discovering the defect. Short, who rode with Dawson from the station to the switch, and who had held on to the identical grip iron which subsequently gave way when Dawson seized it, says that it appeared to be in a proper condition until the screw came out and disclosed the defect in the timber, and so it may have appeared to the defendant's car inspectors. But it is unnecessary, we think, to express a definite opinion upon the question whether a jury of reasonable men

might have found that the defendant was guilty of a want of ordinary care.

Dawson went in between two cars, when, as the witness who was best able to judge says, "they were moving pretty swift," or "tolerably fast," seized the grip iron on the end of the flat car, which was primarily designed to be used by a brakeman for the purpose of making a coupling, and stepped, or attempted to step, on a swinging brake beam, with a view of standing and riding thereon for a distance of about 150 feet, until the car which he had been directed to pick up was reached. It appears that there were stirrups and hand holds on the side of the box car, which he might have used without any risk of injury, if he desired to ride rather than to walk, and that he could have walked to the place where the coupling was to be made without delaying the train for a minute. From any point of view, the risk which Dawson thus took was an unnecessary risk, that might as well have been avoided, and he ought to have avoided it. He was not confronted at the time with an emergency which called for instant and decisive action, such as sometimes confronts railroad men, and compels them to incur considerable risk. He was in a situation where he could have done what he desired to do in a perfectly safe way. He thought proper, however, to place himself in a position of great peril, where a slight misadventure meant instant death or serious injury. Conceding it to be true that brakemen sometimes take such risks without any sufficient cause or excuse, yet such acts should nevertheless be pronounced negligent. Such conduct on the part of brakemen and others ought, also, to be discouraged. If a man exposes himself to great risk unnecessarily, he is guilty of negligence, although it be shown that other persons have done the same thing and escaped unhurt. The inherent quality of an act is not changed, whether it is done by one or many. In the case of Morris v. Railway Co., 47 C. C. A. 661, 664, 108 Fed. 747, 749, this court held, in substance, that where there is a comparatively safe way, known to a person, of doing an act, and there are no obstacles in the way of his employing the safe method, but he deliberately chooses a dangerous method, the perils of which are obvious, he is guilty of negligence, and thereby assumes the risks so incurred. See, also, Loranger v. Railway Co., 104 Mich. 80, 86, 62 N. W. 137; Carrier v. Railway Co., 61 Kan. 447, 451, 59 Pac. 1075; Cunningham v. Railway Co. (C. C.) 17 Fed. 882.

Our conclusion is, therefore, that, in view of the undisputed evidence in the case which this record contains, Dawson must be adjudged to have been guilty of negligence which immediately contributed to his death, and on this ground the lower court properly directed a judgment for the defendant. The judgment below is accordingly affirmed.

CALDWELL, Circuit Judge (dissenting). The act of congress provides that "it shall be unlawful for any railroad company to use any car in interstate commerce that is not provided with secure grip irons or hand holds in the ends and sides of each car for greater security to men in coupling and uncoupling cars." It will be ob-

served that the requirement of the act is that the grip iron or hand hold shall be "secure," and they are to be placed in the ends and sides of each car, for greater security to men in coupling and uncoupling cars. The act does not undertake to direct when the brakeman shall use the grip irons on the side, and when he shall use those on the end, of the car. They are placed near together. Sometimes it is more convenient to use one, and sometimes the other. They are used indifferently, except that when signals are to be given by the brakeman the end hand holds are preferred. On the subject of the use of these hand holds, experienced brakemen and other railroad men testified as follows:

"Q. Is it ever customary, or not, for a brakeman occupying the position that Dawson did, and about to perform the services which he was, to get upon a car while in motion, for the purpose of coupling it onto another car some distance from it? A. It is customary. Q. What is the usual and ordinary way of getting upon a car such as this one was, where they have a hand hold upon the end and also upon the sides of the car? A. They generally use the side when they get on the side, and use the hand hold when they get on the end, or sometimes both,—whichever is convenient."

In answer to this clear proof that the action of the deceased was in accordance with the custom and usage of brakemen under like circumstances, it is said:

"Conceding it to be true that brakemen sometimes take such risks without any sufficient cause or excuse, yet such acts should nevertheless be pronounced negligent. Such conduct on the part of brakemen and others ought also to be discouraged."

The court assumes to know more about the proper way for brakemen to discharge their duties than the brakemen themselves know, and levels its censures at them for not conforming to the court's idea of the proper mode of discharging their duties, but has no word of censure for the railroad company for carrying on its cars an insecure hand hold, certain to result in death or great bodily injury to any brakeman who attempted to use it in the discharge of his duties in the customary mode. It would seem that in such case, if the life and limb of a brakeman are esteemed of any consequence, and their protection thought to be desirable, it is the conduct of the railroad that ought to be "discouraged" by the court's decision, rather than to require the brakemen to adopt some novel and unusual mode of discharging their duties, prescribed by a court which has no more knowledge of the proper and customary mode of discharging those duties than the brakemen have of the intricacies and mysteries of special pleading. The decision in this case is, in effect, a license to the railroad company to carry a death trap on its cars for its brakemen, in defiance of the act of congress which requires them to provide their cars with "secure" hand holds. Manifestly, it were better the act of congress had never been passed, for a car without any sort of hand holds would be preferable to one with insecure hand holds,—hand holds that give way and send the brakeman to his death.

It is obvious from a consideration of the testimony that the brakeman was not guilty of contributory negligence in seeking to support

himself by taking hold of the end hand holds, instead of those on the side. In reference to the defense of contributory negligence it may be observed: First, in the courts of the United States this defense is one which the defendant must prove; second, the rule is that, to establish contributory negligence, "the evidence against the plaintiff must be so clear as to leave no room to doubt, and all the material facts must be conceded or established beyond controversy." Field, Dam. 519; Beach, Cont. Neg. § 447; Railway Co. v. Sharp, 27 U. S. App. 334, 11 C. C. A. 337, 63 Fed. 532; Railroad Co. v. Lowell, 151 U. S. 209, 14 Sup. Ct. 281, 38 L. Ed. 131; Bluedorn v. Railway Co., 108 Mo. 439, 18 S. W. 1103, 32 Am. St. Rep. 615; Weller v. Railway Co., 120 Mo. 635, 23 S. W. 1061, 25 S. W. 532.

The majority of the court seek to prescribe a rule of conduct for brakemen impracticable in practice, and contrary to the established usage and practice in such cases. The standard of care required of a brakeman is the brakeman's standard of care, and not the ideal standard of care of a judge reposing in security and comfort in an upholstered chair in his chambers. It is said the brakeman could have "walked to the place where the coupling was to be made, without delaying the train for a minute." If the hand holds are not to be used where the brakeman could walk to the place of coupling, it follows logically that he must refrain from using them when he could reach the place of coupling by running. Such a standard of care nullifies the act of congress altogether. If trains could only be operated and cars coupled and uncoupled by such ideal standards, a radical revision of railroad time-tables would be necessary. The remark of Lord Hatherly in delivering the judgment of the house of lords in Overend & Gurney Co. v. Gibb, L. R. 5 H. L. 494, is as applicable in this case as it was in that. He said:

"What I did intend to state in that case was that I could not measure—and I think it would be a very fatal error in the verdict of any court of justice to attempt to measure—the amount of prudence that ought to be exercised by the amount of prudence which the judge himself might think, under similar circumstances, he should have exercised."

But the opinion of the majority or minority of this court upon this question is quite immaterial. Whether the brakeman was guilty of contributory negligence, under the circumstances, was clearly a question of fact for the jury, and not one of law for the court. In the case of Jones v. Railroad Co., 128 U. S. 443, 9 Sup. Ct. 118, 32 L. Ed. 478, the circuit court instructed the jury to render a verdict for the defendant upon the ground that the plaintiff had been guilty of contributory negligence, but the supreme court reversed the judgment. The court, speaking by Mr. Justice Miller, said:

"But we think these questions [of negligence] are for the jury to determine. We see no reason, so long as the jury system is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as this as well as others. * * * Instead of the course here pursued, a due regard for the respective functions of the court and jury would seem to demand that these questions should have been submitted to the jury, accompanied by such instructions from the presiding judge as would have secured a sound verdict."

In the case of Railroad Co. v. Ives, 144 U. S. 409, 417, 12 Sup. Ct. 679, 36 L. Ed. 485, the court said:

"It is only where the facts are such that all reasonable men must draw the same conclusions from them that the question of negligence is ever considered one of law for the court."

The proof is overwhelming that the wood in which the hand holds were inserted was soft, black, and rotten. The only inspection of the hand holds, if any was made, was a mere perfunctory, visual inspection. Such an inspection does not satisfy the requirements imposed by law on a railroad company, either as to its own or foreign cars.

In Railroad Co. v. Archibald, 170 U. S. 665, 18 Sup. Ct. 777, 42 L. Ed. 1188, the supreme court said:

"That it was the duty of the railway company to use reasonable care to see that the cars employed on its road were in good order and fit for the purposes for which they were intended, and that its employés had a right to rely upon this being the case, is too well settled to require anything but mere statement. That this duty of a railroad, as regards the cars owned by it, exists also as to cars of other railroads received by it, sometimes designated as 'foreign cars,' is also settled."

In Felton v. Bullard, 37 C. C. A. 1, 94 Fed. 781, it was assigned for error that the circuit court refused to give this instruction:

"If the defect was latent,—that is, one not visible,—the defendant is not liable, if the injury occurred for reason of such latent or invisible defects."

In overruling this assignment of error, the circuit court of appeals of the Sixth circuit said:

"The refusal to instruct in the words of the request is now assigned as error. There was evidence tending to show that neither the broken and rusted condition of one of the screws by which the grip iron was held to the wood of the car, nor the decayed condition of the wood surrounding this broken screw, was visible from the surface. Indeed, the evidence strongly indicated that no mere visual inspection would have disclosed the dangerous condition of this grip iron. But would a mere visual inspection of such an attachment be due and reasonable inspection of such an instrumentality? Was there no other ready means of ascertaining whether it was properly and safely attached, than a visual inspection? If the application of some force would disclose a dangerous weakness, ought not such a force to be applied? The grab iron was about two feet in length. If the weight of a man was thrown upon the end supported by the sound screw, it might hold. But if that weight was thrown upon the other screw, was it likely to indicate any firmness? The facts were not voiceless. They speak for themselves. The condition of the screw supporting one end, and of the wood into which it was screwed, was such, as disclosed by examination after the accident, as to make it obvious that any strain thrown upon that end would disclose the weakness with which it was attached. Did the inspection made involve any strain upon the weak end of this grab iron? If so, did he use it in such way as to really afford a test of the firmness of its attachment? If the inspection made did not involve such a physical test as was feasible, and calculated to disclose just such an infirmity as existed, would not a jury be warranted in finding either that no physical test at all was made, or that, if made, it was so carelessly made as to be useless?"

And in Gutridge v. Railway Co., 105 Mo. 520, 16 S. W. 943, the supreme court of Missouri said:

"The fact that the wood is old and the screws are rusty would naturally suggest to an ordinarily prudent man the propriety of a thorough inspection.

We cannot concur in the contention that an inspector of a hand hold performs his duty, under all circumstances, by simply using his eyes to detect defects."

And after citing authorities the court continues:

"We quote these authorities to show that the master is not always, and under all circumstances, excused if he could not see a defect; and, if the conditions are such as would excite suspicion in a man of ordinary prudence, he must go further and apply other tests. We know that machinery, and the materials composing it, may be tested in various ways. What the ordinary tests, as applied to railroad appliances, are, is not disclosed by this record; but we feel satisfied that looking is not the only test. The master must use such reasonable tests to discover defects as ordinary prudence suggests. The amount of care required is measured by the circumstances of each case, depending upon the kinds of machinery used, the risks incident to its use, and the hazard of the business in which it is used. Whether the defendant could have discovered the defect in the hand hold in this case by the exercise of ordinary care was a question for the jury, and not for the court, to determine."

It is highly probable that the brakeman took hold of the end hand hold in order to be in the best position to signal the conductor. But whether this is so or not is quite immaterial. He was doing something he had an undoubted right to do, and that is customarily done by brakemen in the discharge of like duties. Moreover, it is certain his death was due solely to the insecure hand hold. There is no pretense that he would have been injured if the hand hold had not given way. The defective hand hold was the proximate cause, and the sole proximate cause, of the injury. Even if the deceased was guilty of any negligence, such negligence in no manner contributed to his injury, and the rule is well settled that "negligence which is not a proximate cause of the injury is not contributory negligence." Railroad Co. v. Mansburger, 12 C. C. A. 574, 65 Fed. 196. In Coasting Co. v. Tolson, 139 U. S. 551, 11 Sup. Ct. 653, 35 L. Ed. 270, the supreme court say:

"Contributory negligence will not exonerate defendant if it be shown that defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of plaintiff's negligence."

If the brakeman had taken hold of the side hand hold, and it had given way, and he had been killed, as he might have been, the contention of the railroad company, doubtless, would have been that he should have used the end hand hold, as that was better adapted to the discharge of all his duties as brakeman, namely, riding, coupling, and signaling. But the question of contributory negligence, as well as that of negligence, is also one for the jury; and the evidence in the record in this case leaves no room to doubt that a jury would have found the railroad company guilty of negligence, and the brakeman not guilty of contributory negligence.

I again enter my protest against depriving suitors in this class of cases of their constitutional right of trial by jury, and, without here repeating the arguments and citing the authorities in support of my views, I refer to Railroad Co. v. Ellis, 4 C. C. A. 454, 54 Fed. 481, and my opinions in Railroad Co. v. Whittle, 20 C. C. A. 196, 74 Fed. 296, and Myers v. Railway Co., 37 C. C. A. 137, 95 Fed. 406.

The judgment of the circuit court should be reversed, and the cause remanded, with instructions to grant a new trial.